UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff(s), ) | |
| ) | |
| vs. ) | Case No. 1:08CR 76 JCH |
| ) | |
| MONTECARLO JACKSON, ) | |
| ) | |
| Defendant(s). ) | |

**REPORT AND RECOMMENDATION**

Montecarlo Jackson filed Defendant's Motion to Suppress Statements and Evidence (Document #19). The government filed Government's Response to Defendant's Motion to Suppress (Document #21). An evidentiary hearing was held. A transcript was ordered. Defendant filed his Memorandum in Support of Motion to Suppress Evidence (Document #38), and the government filed Government's Response to Defendant's Memorandum (Document #39).

**Factual Background**

On May 18, 2008, at around 2:00 A.M., Caruthersville Police Officers Brandon Hanner and Randall Lee were patrolling on Adams Street. Both Hanner and Lee were riding bicycles. Hanner observed a Chevrolet Tahoe approaching his location. When the Tahoe passed the two officers, Hanner heard a female screaming something from inside the car. The Tahoe passed the officers, turned on Daeoc Street and parked in a nearby driveway. The officers rode up to the Tahoe on their bicycles.

When Hanner approached the Tahoe, he observed that the driver's door was open and its inside dome light was on. A female was screaming from inside the Tahoe, "Get off of me! Get off

of me!" Hanner saw a man in the driver's seat, striking a female in the passenger seat, "... looked liking he was hitting, assaulting, grabbing the head of the female." (Tr., p. 6). Hanner ordered the man to stop, telling him, "Stop, stop, police." The man looked at Hanner, then turned to continue assaulting the woman and she was still screaming. Id. Hanner then deployed his taser, striking the man. The man fell out of the Tahoe and was placed under arrest for domestic assault and resisting arrest. Hanner did not know the identity of either the man or the woman. The man was later identified as Montecarlo Jackson. Jackson saw Hanner later at the Caruthersville Police Station. At that time, Jackson apologized to Hanner for his actions.

Officer Michael George arrived shortly after Jackson was arrested. He searched Jackson. George found a quantity of marijuana and some ecstacy pills in Jackson's pockets. Those items were seized.

George was present at the police station later that night when Jackson spoke with Officer Matt Fowler. George observed Fowler administer a second Miranda warning to Jackson. Jackson then made incriminating statements to Fowler.

Fowler arrived at the scene within a few minutes after Jackson was arrested. Fowler removed the taser prongs from Jackson and took Jackson to a nearby vehicle. Fowler was also present while Michael George searched Jackson and while Michael Lamp gave Jackson Miranda warnings. Fowler transported Jackson to the Caruthersville Police Station.

During that drive, Jackson stated that he wanted to cooperate, that he would do anything to try to get out of his trouble. Jackson said he was willing to buy drugs and provide information. Fowler told Jackson that they would talk about it at the office, that he could not promise any benefit but that he would pass Jackson's information along to his lieutenant.

When they arrived at the station, Jackson waited around forty-five minutes while Fowler processed the evidence. Fowler then read Jackson a <u>Miranda</u> warning from a preprinted form. Jackson initialed next to each of the rights and then signed below the acknowledgment that he had read the above statement of his rights, that he understood each of those rights, and having these rights in mind, he waived them and was willing to make a statement. (Ex. 1). (Tr., p. 34, 35, 51).

Jackson then spoke to Fowler. Jackson told Fowler that his source for the drugs found on him that evening was Billy Griffin. Jackson made other statements to Fowler about his own drug activity and the drug sales of others. Fowler typed Jackson's statement on his computer, printed it and asked Jackson to read it. Jackson did so. He agreed that the printed statement. (Ex. 2) was accurate. Jackson then signed the form indicating his agreement with the contents of the statement. (Ex. 3). Jackson was released from custody with a summons for domestic assault.

## Discussion

In Defendant's Motion to Suppress Statements and Evidence (Document #19), the defendant requests the court for an order excluding any and all statements made by him to law enforcement officers at or near the time of his arrest on May 18, 2008. The defendant states as grounds that any statements were obtained in violation of his rights under the Fifth Amendment of the Constitution of the United States. Defendant also moves the court to suppress any and all evidence seized from or on or about the person of Montecarlo Jackson at or near the time of his arrest on the grounds that such seizure was conducted in violation of his rights under the Fourth Amendment of the Constitution of the United States.

## Physical Evidence

It is clear from the testimony provided at the evidentiary hearing that the defendant was

arrested for Domestic Assault. The officers observed the defendant hitting his wife when they rode upon the scene of the incident. The defendant was searched and the search was incident to his valid arrest. Michigan v. DeFillippo, 443 U.S. 31, 35 (1979); United States v. Bratt, 355 F.3d 1119, 1121 (8th Cir. 2004), citing United States v. Robinson, 414 U.S. 218, 236, 94 S.Ct. 467 (1973).

The contraband on the defendant's person, marijuana and ecstasy pills, was legally seized and is admissible in evidence.

### **Waiver I**

According to the testimony, the defendant was advised of the Miranda warnings twice, the first time by Officer Michael Lamp at the scene of the arrest and the second time at the Caruthersville Police Department. It is the government's position that the defendant validly waived his rights under Miranda both times. It is the defendant's position that neither waiver was voluntary and, therefore, both waivers were invalid with the result that defendant's statements should be suppressed.

The gist of the defendant's argument with regard to the first waiver of his Miranda rights was that after having been subjected to a 50,000-volt taser, the defendant was in no condition to voluntarily waive anything. The defendant elaborates his contention in his memorandum describing Exhibit #4, a video taken by a camera attached to Officer Hanner's taser which depicted the scene visually and audibly. The defendant alleges that the video "thoroughly depicts a chaotic and hectic event. It is obvious that Defendant Jackson suffered a great deal of pain, hysteria and probable confusion upon being on the wrong end of a 50,000-volt taser. Both Defendant Jackson's mental and physical conditions are plainly evidenced in said exhibit by his constant verbalizations." (Doc. #38, p. 2).

The court has viewed and listened to the tape depicting the tasing of Mr. Jackson and at the

beginning of the tape, the scene is chaotic. Mr. Jackson is yelling various things, "That's my wife, man;" "Call Mike, man;" "Call my lawyer;" "Oh my God, he's going to tase me and I didn't do nothin'."

Mr. Jackson continually stated that he had not done anything. He asks his wife to "Please tell these people [that he had done nothing]." He yelled to the officers that he was with his wife and he was taking her to the project.

The video is approximately seven minutes and 35 seconds long. At the four-minute point, the defendant begins to become relatively calm. At the five-minute mark, the defendant seems completely calm. Toward the end of the video, Mr. Jackson asks "Why you want to treat me like that, man?"

Apparently, his wife was not going to help him, according to Officer Hanner, who reported "And while he was on the ground the female passenger came out of the vehicle and was trying to get to him. I was trying to hold her back even after the taser stopped cycling." (Tr., p. 8).

Various officers testified concerning the effects of a taser. Officer Hanner stated that the taser application is painful during the five seconds that it is on, but that after the five seconds there is no pain to the taser recipient. Officer Hanner had been tased at his own request. He reported, "As soon as the tasing, the actual shock stops, you feel a moment of relief. But the pain doesn't continue, no, sir." (Tr., p. 13).

It was Officer Fowler who removed the taser probes from Mr. Jackson. He said that Mr. Jackson went from being combative to cooperative. (Tr., p. 33). Fowler testified the taser does not have any lasting effect. (Tr., p. 60).

The government points to United States v. Annis, 446 F.3d 852 (8th Cir. 2006), in which the defendant argued that a statement he gave was involuntary because he was suffering from the pain

- 5 -

of broken facial bones and methamphetamine withdrawal at the time of his statement. The Court found that "'The test is whether these mental impairments caused the defendant's will to be overborne.' United States v. Casal, 915 F.2d 1225, 12229 (8th Cir. 1990). Annis provided no evidence that his pain and meth withdrawal caused his will to be overborne." Id. at 856. In the same way, Mr. Jackson offered no evidence that his will was overborne. As the court noted earlier, toward the end of the video tape, Mr. Jackson appeared to be calm and quiet. In fact, his statements and attitude while riding in the car to the Caruthersville Police Station belies an assertion that his will was overborne.

Officer Matt Fowler transported the defendant from the arrest scene to the Caruthersville Police Department. On direct examination, he testified:

Q. Did Mr. Jackson make any statements to you while you were transporting him to the police station?

A. He stated he wanted to cooperate and do anything he could to try to get out of the trouble that he was in.

Q. What was Mr. Jackson's demeanor?

A. He went from being combative at the scene to willing to cooperate and do whatever he could to get out of what trouble he had landed himself into.

Q. And did Mr. Jackson make any references as to what form his cooperation would take?

A. Yes. He stated he was willing to try to buy dope and give information on some of the drug dealer there is in Caruthersville.

Q. Did you say anything to Mr. Jackson to illicit (sic) this promise or –

>   A. No.
>
>   Q. -- to this officer?
>
>   A. I told him we'd talk about it and I would pass the information on to my lieutenant and if he could do anything, he'd go from there.

(Tr., p. 33).

The defendant had the presence of mind, in view of the fact that marijuana and ecstasy pills had been found on his person, to attempt to see how he could help himself by cooperating with the police.

On cross-examination, Officer Fowler was asked about statements made by Mr. Jackson while he was being transported in the squad car:

>   Q. You indicated that he had maybe said some things to in the car, in the squad car.
>
>   A. Yeah.
>
>   Q. And had you responded to any of his statements or followed up with any questions?
>
>   A. No, I just told him that we'd talk about it when we got to the office.
>
>   Q. So whatever, whatever he, whatever was said in the patrol car, you didn't respond to any of that?
>
>   A. No, I just told him that we'd talk about it when we got to the office.

(Tr., p. 50).

A further indication of Mr. Jackson's state of mind following his being subjected to the taser was the fact that at the police station he apologized to Officer Hanner for the way he had acted that

night. (Tr., p. 15). It appears that Mr. Jackson was aware of his previous actions and that they called for an apology to Officer Hanner. Id.

There is no evidence to indicate that Mr. Jackson's will was overborne.

In his memorandum, the defendant also states that he was under the influence of alcohol. In the Annis case, the court stated, "This court, though, has declined to adopt a per se rule of involuntariness founded solely on intoxication. See United States v. Makes Room, 49 F.3d 410, 415 (8th Cir. 1995)." The Court then stated the test for voluntariness to be whether mental impairments cause the defendant's will to be overborne, as cited earlier in this report and recommendation.

There is a reference to alcohol in the testimony of Officer Matt Fowler during the interview which took place at the Caruthersville Police Station:

> Q. Did Mr. Jackson seem to be under the influence of any alcohol or any other type of controlled substance during your interview?
>
> A. He, he, I believe, had a few drinks but I mean he didn't appear to be, I mean his speech wasn't slurred. I mean, he was very coherent and he knew what was going on.
>
> Q. What makes you think he had a few drinks?
>
> A. I mean, I could, I could smell a little bit of alcohol on him but nothing, nothing major. I mean, I knew he had been at a party and stuff, so.

(Tr., p. 59).

The court finds that there is no evidence that the defendant's will was overborne, either by his experience with the taser or from alcohol that he may have consumed.

All the evidence points instead to the fact that after being tased and then calming down, the

defendant proceeded to attempt to make a deal to get himself out of what he had gotten into.

The court finds the waiver of his Miranda warnings at the arrest scene by the defendant was voluntary and knowing.

Although the court has found that the defendant's waiver of his Miranda rights was voluntary and knowing, the administering of the Miranda warnings was not necessary under the circumstances which existed when the defendant made his comments as he was being transported from the scene of his arrest to the Caruthersville Police Department. The testimony of Officer Matt Fowler, who transported Mr. Jackson, set out above (pp. 6-7 of Report and Recommendation) establishes that Mr. Jackson was not being questioned and Officer Fowler stated he did not do anything to elicit Mr. Jackson's statement that he wanted to cooperate and do anything he could to try to get out of the trouble he was in. Under the evidence, the comments by Mr. Jackson were volunteered statements and not in response to interrogation. There is no question that Mr. Jackson was in custody when the remarks were made; however, both custody and interrogation are necessary before Miranda warnings are required. Illinois v. Perkins, 496 U.S. 292, 296 (1990).

Because of the contents of the video tape, Government's Exhibit #4, another question arises. Early in the incident of Mr. Jackson's arrest, he yelled out, "Call Mike.", "Call my lawyer." and other exclamations. Should the parties and the court consider Mr. Jackson's yelling "Call my lawyer" an invocation of one of his rights under the Miranda decision? This court believes the answer is no. "Call my lawyer" is just one of many exclamations addressed possibly to his wife while he was being tased or had just been tased. It may have been an attempt to prevent tasing or to being subjected to a second tasing. If Jackson had said "Call my lawyer" in the context of being given the Miranda warnings, it would have had a completely different meaning. "An assertion of one's Miranda rights

must be neither ambiguous nor equivocal." Simmons v. Bowersox, 235 F.3d 1124, 1132 (8th Cir. 2001), citing Davis v. United States, 512 U.S. 452, 459, 114 S.Ct. 2350 (1994) (applying the standard in determining whether a suspect had invoked his right to counsel.) The court finds that the defendant's yelling "Call my lawyer" at or near his being tased was not an invocation of his right to counsel as envisioned by the Court in Miranda.

Finally, one may not use "boot-strap" arguments to prop up a finding where a basis in fact is not present, but the fact that within a short time (within an hour) (Tr., p. 50, 51), the defendant waived the Miranda warnings in writing a second time lends support to the argument that his waiver at the arrest scene was not involuntary.

Under the totality of the circumstances presented to the court, the court finds that defendant's waiver of his rights under Miranda v. Arizona at the arrest scene was voluntary and knowing. Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973).

## Waiver II

After Mr. Jackson was brought to the Caruthersville Police Department, he had to wait for forty-five minutes while Officer Fowler field-tested the purported controlled substances found and took care of storing the evidence. (Tr., p. 51).

Officer Fowler described how he administered the Miranda warnings at the police department. He testified that he took a Caruthersville Police Miranda warning form and advised Mr. Jackson of all the rights, read it word for word and asked him if he understood and Mr. Jackson said he did. Fowler asked Jackson if he wished to waive those rights and speak to him and Fowler asked the defendant to sign the form if he was willing to waive his rights and speak to him. The defendant initialed each right and signed the form. (Tr., p. 34). He stated he understood his rights. (Tr., p. 35).

Mr. Jackson told Officer Fowler he wanted to talk to the officer "to try to help himself to get out of his trouble." (Tr., p. 36).

Government's Exhibit #2 was the written statement given by the defendant to Officer Fowler. Fowler testified about the manner of the statement's preparation:

> A. I typed it up on the computer, what he told me, and had him, after I printed it out, I gave it to him, had him read it. Asked him if there needed to be anything changed on it, anything added, taken away. He stated, no, and I asked him if it was correct to sign it.
>
> Q. And so there were no changes made from the original typed version that you prepared?
>
> A. No. I prepared one version and that's the one he signed.
>
> Q. And did Mr. Jackson just read this or do you read it to him word for word?
>
> A. He, he read it.
>
> Q. All right. Did Mr. Jackson ask you any questions about the printed words that were on the paper.
>
> A. No.

(Tr., p. 36-37). No threats were made to Mr. Jackson to get him to speak to Fowler. (Tr., p. 39). Jackson was released with a summons to appear in court for Domestic Assault. The interview lasted approximately thirty minutes. (Tr., p. 46).

Officer Fowler was asked if, during the interview, Mr. Jackson seemed to be affected by the prior taser use. Fowler answered, "No." Asked if there were any visible signs, Fowler answered, "No, he was absolutely normal. The tazer doesn't have any lasting effect." (Tr., p. 60).

When asked on cross-examination whether Mr. Jackson seemed to be under the influence of any alcohol or any other type of controlled substance during the interview, Fowler replied that Mr. Jackson had a few drinks but his speech was not slurred. He was very coherent and he knew what was going on. (Tr., p. 59).

In his Memorandum in Support of his Motion to Suppress Evidence, the defendant asserts "Without a doubt, Defendant Jackson's free will and capacity for self determination were overcome by implied and possibly express promises of leniency that occurred prior to the alleged reading and waiver of his rights as they related to Miranda." The defendant then offered Officer Matt Fowler's testimony at the suppression hearing as corroboration:

> Q. He wasn't charged with any type of controlled substance offense at the time?
>
> A. He was–we told him we would see if he could do anything and, before we forwarded anything to the prosecutor.
>
> Q. So he was offered some type of leniency if he could do some things, as you said?
>
> A. Like I said, I wasn't in a position to promise him anything. The only thing I could do is tell him that if he was able to work, anything that he done would be told to the prosecutor.
>
> Q. When was he given this option?
>
> A. When we got to the police department. I talked to him.
>
> Q. Prior to the interview?
>
> A. Yes.

(Tr., pp. 56-57)(cited in Document #38, Defendant's Memorandum at p. 4).

Officer Fowler was then asked if he thought that Mr. Jackson was under the impression that something favorable would happen to him if he gave a statement. Officer Fowler replied, "I mean, I assume he could assume that, I mean." (Tr., p. 62).

It is the defendant's position that he was promised leniency if he would give a statement.

The court does not see from the testimony that Mr. Jackson was promised leniency. In response to Mr. Jackson's attorney's question, "So he was offered some type of leniency if he could do some things, as you said?" Officer Fowler responded, "A. Like I said, I wasn't in a position to promise him anything. The only thing I could do is tell him that if he was able to work, anything he done would be told to the prosecutor." (Tr., pp. 56-57).

Later, still in cross-examination, Officer Fowler was asked,

> Q. Are you saying there were not any promises made?
>
> A. No. He was not promised anything. I wasn't in the capacity to promise him anything.
>
> Q. But was it implied to Mr. Jackson that if he assisted that he would face some type of leniency or –
>
> A. We – I advised him that if he was able to work and, and do good, that we would go to the prosecutor and advise them of everything that he had done. And it's ultimately up to the prosecutor whether or not he still wants to charge. I mean, we can't promise that he's not going to do that.

(Tr., pp. 61-62).

Officer Fowler made it clear that he could not promise Mr. Jackson anything, that they would

report to the prosecutor what Mr. Jackson said or did and that it was ultimately up to the prosecutor whether to proceed with charges.

Officer Fowler was then asked on redirect if Mr. Jackson could assume that he was getting some sort of benefit, whether that was based on any meaning that was attributable to Officer Fowler's words. Officer Fowler responded,

> A. No, I mean, it was just like I advised him, I couldn't promise him anything. I was going to forward everything to Lieutenant Coleman, and Lieutenant Coleman and the task force would be the ones to work with him. And then they would be the ones to go to the prosecutor and let them know. I explained all that to him, that I couldn't offer him anything.
>
> Q. So are, are we talking then in terms of Mr. Jackson might have hoped that that would have happened?
>
> A. That's correct.

(Tr., pp. 62-63).

Whether Officer Fowler assumed that Mr. Jackson could assume that something favorable would happen to him if he gave a statement is not determinative of whether Mr. Jackson's will was overborne.

The court finds Defendant Jackson's will was not overborne in his interview with Officer Fowler at the Caruthersville Police Station.

In United States v. Mendoza, 85 F.3d 1347, 1351 (8th Cir. 1996), the agents' promise that they would make Wheeler's cooperation known to the United States Attorney did not transform an otherwise voluntary statement into an involuntary one.

Here there was no promise of leniency, but even if there had been a promise of leniency, that by itself does not make a confession involuntary. United States v. Kilgore, 58 F.3d 350, 353 (8th Cir. 1995)(promise of leniency, by itself, does not make confession involuntary). In United States v. Harris, 914 F.2d 927, 933 (7th Cir. 1990), the Seventh Circuit found that police may solicit a confession by offering to reduce charges against the defendant.

The cases do not support the defendant's contention that under the circumstances of his interview with Fowler his will was overborne. In United State v. Hocking, 860 F.2d 769, (7th Cir. 1988) FBI agents' threats that defendant faced criminal charges and imprisonment did not make defendant's confession involuntary. In Kilgore, supra, 58 F.3d at 353, defendant's statement was voluntary despite evidence that defendant's motivation in confessing was to recover his impounded car and not spend the night in jail. In United States v. Nash, 910 F.2d 749, 752-53 (11th Cir. 1990), an officer's discussion of realistic penalties for cooperative and non-cooperative defendants did not make defendant's confession involuntary.

Again, in the Mendoza case, an agent told Defendant Wheeler that she would be arrested immediately if she did not cooperate. The Court found that "This single statement was not so coercive as to deprive Wheeler of her ability to make an unconstrained decision to confess." 85 F.3d at 1351. In United States v. Meirovitz, 918 F.2d 1376, 1379 (8th Cir. 1990, cert. denied 1991), the Court found that agents' threats of a long prison sentence if defendant failed to cooperate did not make his statements involuntary. See also Sumpter v. Nix, 863 F.2d 563, 565 (8th Cir. 1988), in which the Court found a confession was voluntary, even though the defendant had a below-average IQ, was subjected to seven and one-half hour interrogation with an agent who played on his emotions.

The defendant urges that "Circumstantial evidence points to the fact that Defendant Jackson

was, in fact, promised and granted some form of leniency for giving a statement." (Defendant's Memorandum, p. 4). As substantiation, defendant argues he was only given a summons for domestic assault and not charged with a crime related to controlled substances.

As the cases cited above state, a promise of and granting of leniency does not make a confession involuntary. However, the court considers a more accurate interpretation of the defendant's being charged with domestic assault and not a drug offense is that, as Officer Fowler testified a number of times at the hearing, the information of any cooperation by Jackson would be conveyed to the prosecutor and the prosecutor would decide whether to charge Mr. Jackson further. (Tr., pp. 56-57, 61-62).

The Eighth Circuit quoted from the Supreme Court when it considered the weight to be given to the administering of Miranda warnings in relation to the voluntariness of a confession in Simmons v. Bowersox, 235 F.3d 1124, 1132 (8th Cir. 2001): " '[c]ases in which a defendant can make a colorable argument that a self-incriminating statement was "compelled" despite the fact that the law enforcement authorities adhered to the dictates of Miranda are rare.' " Dickerson v. United States, 530 U.S. 428, 120 S.Ct. 2326, 2336 (2000) (quoting Berkemer v. McCarty, 468 U.S. 420, 433, n. 20, 104 S.Ct. 3138 (1984).

The court finds the will of Defendant Montecarlo Jackson was not overborne either at the scene of his arrest or during the interview at the Caruthersville Police Station.

The statements of the defendant were made knowingly and voluntarily and are admissible in evidence.

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Statements and Evidence (Document #19) be denied.

The parties are advised that they have eleven (11) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

                                                LEWIS M. BLANTON
                                                UNITED STATES MAGISTRATE JUDGE

Dated this 30th day of April, 2009.